R. A. Stanchfield v. Commissioner.
Stanchfield v. Commissioner
Docket No. 21326.
United States Tax Court
1950 Tax Ct. Memo LEXIS 183; 9 T.C.M. (CCH) 471; T.C.M. (RIA) 50141; June 6, 1950
*183 O. A. Brecke, Esq., 748 McKnight Bldg., Minneapolis, Minn., for the petitioner. Thomas A. Steele, Jr., Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner has determined that there is a deficiency in income and victory tax for the year 1943 in the amount of $27,682.56. Petitioner concedes that a minor adjustment was properly made by the respondent. There are two questions to be decided, as follows: Whether the petitioner is taxable on all of the net income for 1943 of a business known as Priority Mills; and whether the petitioner is taxable on 50 per cent of the net income for 1943 of a business known as International Sugar Feed Company. The petitioner contends that his wife was a partner in the conduct of the business of two partnerships doing business under the above names; and that she is taxable on one-half of the income of Priority Mills, and on one-fifth of the income of International Sugar Feed Company. The petitioner filed his income tax return for 1943 with the collector for the district of Minnesota. The record consists of testimony, various exhibits, and a stipulation of some of the facts, from which *184 the following findings of fact are made. Findings of Fact The facts which have been stipulated are found as facts, and the stipulation is incorporated herein by this reference. In 1943, the petitioner resided with his wife and children in the Village of Deephaven, which is near Minneapolis, Minnesota. In 1943, the petitioner was 27 years old. The petitioner married Vivian Martin in 1936, when he was about 20 years of age. In 1943, the petitioner's family consisted of his wife, and three children - a daughter, who was six years old, and twin sons, who were two years old. During 1943, the father and mother of the petitioner were living. Petitioner's father, Archie L. Stanchfield, was, during the year 1943 and prior thereto, a member of a partnership which conducted a wholesale grain and feed business in Minneapolis under the name of A. L. Stanchfield and Company. During 1942, and for nine years prior, the petitioner was employed by A. L. Stanchfield and Company. His salary for the year 1942 was $5,324. Petitioner's work included buying and selling grains and feeds. Petitioner was well acquainted with the business of the above named concern in 1943, after ten years' employment. *185 Prior to February, 1943, the principal item of property owned by the petitioner and his wife was a homestead, which was held in a joint tenancy. This homestead was acquired in 1942 for $12,000, of which the petitioner contributed $5,000 from his savings, and a gift of $7,000 from his father. Petitioner's wife has never been employed and does not have any business experience. In 1943, she had no capital of her own. During 1943, she devoted her entire time to her housekeeping and the the care of her three young children. (1) The business conducted under the name of Priority Mills At sometime in 1942, A. L. Stanchfield and Company purchased an old mill from the State of Minnesota, but it remained idle and unused. It was located in Minneapolis. At sometime before February, 1943, the petitioner proposed to his father that he be permitted to carry on operations in the mill for the mixing of feeds. Petitioner's father agreed to the proposal. Because of shortages of supplies in the feed business in 1943, the petitioner and his father believed that there would be little, if any, difficulty in selling whatever feed could be mixed. Accordingly, on or about February 1, 1943, business *186 operations were undertaken in the old mill under the name of Priority Mills. The building and all of the equipment therein were owned by A. L. Stanchfield and Company, and it rented the premises to Priority Mills for $100 per month. In December, 1943, the rent was increased to $250 per month. Priority Mills had no building, machinery, or any other fixed assets in 1943. The business of Priority Mills was the milling of grains into flour, the sale of flour, the mixing and preparation of grain products into feed and cereals, and the sale thereof. The grains and feeds which were processed by Priority Mills were purchased from A. L. Stanchfield and Company, from the Commodity Credit Corporation, and, in minor instances, from others. On or about February 1, 1943, $10,000 was obtained from petitioner's father as a loan. Negotiations for the loan were carried on by the petitioner alone. His wife took no part in the negotiations. The borrowed funds consisted of a check of A. L. Stanchfield and Company for $10,000 payable to Priority Mills. The check was delivered to petitioner, and he endorsed the check as follows: "Priority Mills by R. A. Stanchfield." Petitioner deposited the check in *187 the bank account of Priority Mills. A non-interest bearing, demand, promissory note to the order of A. L. Stanchfield and Company, dated February 1, 1943, in the amount of $10,000, was given for the loan. The note was signed by petitioner and his wife. Petitioner's father wanted petitioner's wife to sign the note, with her husband, so that she would be aware of the fact that a debt had been incurred. He would have required the wife of anyone to whom he loaned money to sign the note evidencing the loan. The loan was paid two months later, on April 14, 1943, out of the profits of the business of Priority Mills, by a check of Priority Mills. The check was signed by R. A. Stanchfield, the petitioner, and was made payable to A. L. Stanchfield and Company. Upon repayment of the loan by Priority Mills, the note was inscribed as follows: "Received Payment in full April 14, 1943 A. L. Stanchfield & Co., by A. L. Stanchfield." Petitioner's wife did not borrow any money from petitioner's father; she did not lend any money to Priority Mills; and she did not make any capital contribution to Priority Mills. On February 1, 1943, the petitioner and his wife executed an instrument entitled "Partnership *188 Agreement." This instrument provided that capital should be contributed in equal amounts by each of the parties and that they should share equally in the net profits and losses of the business to be known as "Priority Mills." The agreement provided, also, that the compensation to be paid to either of the partners for services actually rendered in the conduct of the business should be fixed by the partners from time to time, and that any such compensation for services should be deducted from gross earnings as a business expense. During 1943, the entire management of the business of Priority Mills was in the hands of petitioner. Petitioner's wife rendered no services in the operation of the mill, and she did not have any knowledge of the business conducted by Priority Mills. Neither the business stationery nor the sign at the place of business listed the petitioner's wife as a partner. No ledger accounts were kept by Priority Mills during the year ending December 31, 1943. There was no capital account in the name of petitioner's wife. The business transactions of Priority Mills were entered in a columnar cash journal. From February, 1943, until the last week of August, 1943, the *189 petitioner took weekly withdrawals from the business, by checks to his order in the amount of $32. From the last week in August, 1943, until the end of the year, weekly checks in the amount of $32 were drawn payable to petitioner's wife. These weekly disbursements were used by petitioner's wife to pay household expenses and for her personal needs. Approximately $16,500 was withdrawn from Priority Mills during 1943 for the purchase of additional land adjoining the homestead of petitioner and his wife, and to make improvements thereon for an experimental poultry feeding farm. However, the experimental feeding project was not carried on in 1943. Title to this property was held in the names of petitioner and his wife as joint tenants. During 1943, $10,000 was withdrawn from Priority Mills for making a contribution to the capital of another partnership known as International Sugar Feed Company. Other withdrawals listed in the "Personal" column in the journal included $10,000 to repay the loan of petitioner's father; $6,000 for petitioner's salary; $500 for insurance; and $1,000 for the purchase of war bonds. The profit and loss statement of Priority Mills for 1943 showed the following: *190 Gross Receipts
$730,124.11
Cost of Goods Sold
$605,459.64
Labor Cost
50,276.90
Other Expenses
17,461.88
673,198.42
Profit
$ 56,925.69
The balance sheet of Priority Mills as of December 31, 1943, showed the following: ASSETS
First National Bank
$ 1,744.85
Accounts Receivable
37,682.43
Unbilled Charges
620.17
Inventories
4,548.86
Equipment
444.75
Deficit
479.04
$45,520.10
LIABILITIES
Accounts Payable
$42,643.58
Accrued Taxes Payable
2,876.52
$45,520.10
The business known as Priority Mills was the sole proprietorship of the petitioner in 1943, and was wholly owned and operated by him. Petitioner's wife did not contribute any capital to the business known as Priority Mills. The petitioner and his wife did not in good faith and acting with a business purpose intend to join together as partners during 1943 in the present conduct of the business known as Priority Mills. (2) The business conducted under the name of the International Sugar Feed Company On April 15, 1943, petitioner's father purchased for $10,000 all of the assets of International Sugar Feed Corporation which consisted of formulae, trade name, *191 good will, mailing lists, and a state license to sell feed. Shortly thereafter, an oral agreement was entered into between A. L. Stanchfield, petitioner's father; E. R. Stanchfield, petitioner's mother; Mylla Peterson, petitioner's sister; the petitioner; and petitioner's wife. It was agreed, orally, that the aforesaid persons would contribute $5,000, each, for a one-fifth interest in a general partnership, which would be organized for the purpose of taking over the assets of International Sugar Feed Corporation. There was no written agreement during 1943. It was agreed, also, that a business would be conducted under the name of International Sugar Feed Company, which is referred to hereinafter as Sugar Feed. About March 1, 1944, a written instrument was executed by the aforementioned parties which provided for the formation of a new limited partnership, for a term of 15 years from March 1, 1944. Under this agreement, each of the parties was to contribute $5,000 to the capital, and was to receive a one-fifth interest in the partnership. Petitioner and his father were to be the general partners, and the other parties were to be limited partners. Petitioner, his wife, and his sister *192 were to contribute to capital $5,000, each, in cash, under the written agreement; and the father and mother of petitioner were to contribute $5,000, each, but their contribution was to consist of the assets above mentioned of the former Sugar Feed Corporation. The assets which had been acquired from the International Sugar Feed Corporation were turned over to the partnership known as Sugar Feed, in 1943, as the capital contributions of A. L. and E. R. Stanchfield, the father and mother of petitioner. On May 19, 1943, petitioner drew a check on Priority Mills for $10,000, payable to Sugar Feed, which he designated as the capital contribution of himself and his wife. Later, in November, 1943, Mylla Peterson, petitioner's sister, paid $5,000 to Sugar Feed as her capital contribution. Sugar Feed, during 1943, was engaged in the business of selling stock feed which was processed for it by Priority Mills. Both businesses shared the mill owned by A. L. Stanchfield and Company. Some of the feeds processed by Sugar Feed were purchased from Priority Mills, and from September 30 to December 31, 1943, Sugar Feed paid $38,847.19 to Priority Mills. During 1943 the business of Sugar Feed was *193 under the management of Harold Savage, who had been with the former concern having the same name. The petitioner and his father rendered minor services to Sugar Feed during 1943. For his services, the petitioner was paid $800. The petitioner's wife, mother, and sister rendered no services to Sugar Feed. The petitioner's wife did not participate in any way in the management or operations of the business of Sugar Feed during 1943. None of the earnings of Sugar Feed for 1943 were withdrawn. The corrected net income of Sugar Feed for 1943 was $33,562.34. No certificate was filed with the Clerk of the District Court of Hennepin County, Minnesota, until March 15, 1944, setting forth the assumed name under which the business of Sugar Feed was conducted, or the names of the persons conducting the business. The petitioner's wife did not contribute, in 1943, $5,000, or any other amount, to the capital of Sugar Feed. She did not receive a gift in 1943 of $5,000 for contribution to the capital of Sugar Feed. The petitioner did not, in good faith and with a business purpose intend to join with his wife in partnership in 1943 for the present conduct of the business known as Sugar Feed. The petitioner *194 contributed $10,000 to the capital of Sugar Feed in 1943. Opinion Issue 1. In considering the question of whether a husband and his wife, or other members of a family group, are members of a partnership, and as such are individually taxable upon shares of the income of a business, the Supreme Court has said in Commissioner v. Culbertson, 337 U.S. 733, that: "* * * The question is whether, considering all the facts - the agreement, the the conduct of the parties and execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of the income and the purpose for which it is used, and any other facts throwing light on their true intent - the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." See, also Commissioner v. Tower, 327 U.S. 280. Accordingly, consideration has been given to all the facts and circumstances which show the intent of the parties. It is concluded from all of the evidence that the petitioner, in 1943, did not "in good faith and acting *195 with a business purpose" intend to join with his wife as a partner in the present conduct of the business known as "Priority Mills." The petitioner concedes that his wife took no part in the control and management of Priority Mills, that she performed no services for the business, and that her time was spent in running their household and caring for their three young children. Admittedly, the wife had no business experience and knew nothing about the running of the business of Priority Mills. The petitioner rests his claim to partnership status for his wife primarily upon the contention that she contributed capital to the business. It is pertinent, therefore, to inquire into the nature of the alleged capital contribution of petitioner's wife, as well as the extent to which the earnings of Priority Mills were derived from capital. Commissioner v. Tower, supra; Molly A. Harkness, 13 T.C. 1039. Priority Mills began business in 1943 with $10,000 capital, which was borrowed from petitioner's father. This loan was evidenced by a demand non-interest bearing note which was signed by petitioner and his wife. The petitioner argues that his wife risked her capital *196 in the business because she signed this note. But the bare fact that the petitioner's wife signed the note with her husband is not evidence that she made an investment of capital in the business. See Smith v. Henslee, 72 Fed. Supp. 362; aff'd., 173 Fed. (2d) 284; Nordling v. Commissioner, 166 Fed. (2d) 703; certiorari denied, 335 U.S. 817; W. A. Belcher, 7 T.C. 182; aff'd., 162 Fed. (2d) 974. The petitioner's father testified in this proceeding that, as a matter of business practice, he would require the wife of anyone to whom he made a loan to sign the note which was evidence of the loan, and that he particularly wnated the petitioner's wife to sign the note with her husband "so that she as well as he would know there was an obligation there that had to be paid." The record is lacking in any evidence to show that the petitioner's wife took part in any of the negotiations for the loan. She had no assets of her own. She did not have any dominion or control over any part of borrowed funds. The loan was made by a check for $10,000, payable to Priority Mills, which was delivered to the petitioner, and was deposited *197 by him in the bank account of Priority Mills. No additional security was provided by the wife, and her credit was in no way relied upon. The only property in which she had any interest at the time the note was executed was her interest in the homestead. But her interest in the homestead could not constitute security for the note because under Minnesota law (Minnesota Statutes, 1945, chapter 510) a homestead was exempt from seizure or sale under legal process on account of a debt of the kind evidenced by the note, and no waiver of the homestead exemption was given, or was required by petitioner's father. The record does not disclose what the capital of Priority Mills, if any, was during 1943, apart from the initial loan of $10,000, and the earnings of the business. No capital accounts were set up on the books of the business, and the evidence does not show that, as between petitioner and his wife, any capital account was ever recognized. It appears that capital was not an important factor, in the conduct of the business of Priority Mills. It rented the mill, including the machinery located therein, for a rental of $1,100 for the year. There appears to have been a quick turnover *198 of inventory of grain and feed. The loan of $10,000 was repaid shortly after two months. For the year of 1943, the gross receipts of the business amounted to $730,124.11, and the adjusted net income was $56,925.69. Although the business of Priority Mills was not strictly a personal service business, such as an insurance agency, or the practice of accounting, law, or engineering, the business was that of buying and selling grains and feeds, and the petitioner's ten years' experience in a similar business, his ability, and his personal efforts constituted the real operation of the business and were the main generating source of its income. Cf. Lucas v. Earl, 281 U.S. 111; Earp v. Jones, 131 Fed. (2d) 292; certiorari denied, 318 U.S. 764; William G. Harvey, 6 T.C. 653; Francis Doll, 2 T.C. 276; aff'd., 149 Fed. (2d) 239; certiorari denied, 326 U.S. 725. Whatever capital was used by Priority Mills was used to purchase the grains and feeds which were processed, and to pay wages and current operating expenses. Capital was not a factor in the production of income in the sense that fixed capital *199 is employed in a manufacturing enterprise, or in any business which requires invested capital. Aside from the two months' loan, there was no invested capital in Priority Mills. At the end of the year, all the earnings of the business had been withdrawn; the $10,000 loan had been repaid; and Priority Mills owned no fixed assets. Approximately five-sixths of its total assets consisted of accounts receivable, at the end of the year. The only payments made to the petitioner's wife during 1943 were weekly checks for $32 from the last week in August until the end of the year. These payments were used by her to run the household and for incidental personal needs. Aside from these weekly payments, she did not receive any of the income arising from the operation of the alleged partnership, and she did not have any actual control over any of the earnings. On the other hand, petitioner had the complete dominion and control over the earnings and over the operations of Priority Mills. See Commissioner v. Culbertson, supra. The petitioner places some reliance upon the fact that Priority Mills was a new enterprise. But the fact that a business is new does not eliminate the necessity *200 for meeting the objective legal tests of whether a partnership consisting of a husband and wife exists for purposes of Federal taxation. The decisive test is whether the parties really and truly intended to join together as partners in the present conduct of a business. Upon this question the petitioner has the burden of proof. After due consideration of all the evidence, it is concluded that the petitioner has failed to show that his wife made any contribution to the capital of Priority Mills. It is held that petitioner's wife did not become a partner in 1943 in the operation of the business known as Priority Mills. It has been found as a fact that Priority Mills was a sole proprietorship, owned and operated by petitioner. The respondent is sustained in his determination that the petitioner is taxable upon all of the income of Priority Mills for 1943. Issue 2. Under the second issue, it is concluded, also, upon all of the evidence, that the petitioner's wife was not a bona fide partner in the conduct of the business known as Sugar Feed. Careful consideration has been given to all of the evidence, and particularly to that which relates to the intention of the parties. The petitioner *201 contends that his wife contributed capital to the business known as Sugar Feed. Admittedly, she performed no services for Sugar Feed, and she had no voice in the control or management of the business. The capital which was contributed to Sugar Feed, and which the petitioner contends was contributed, in part, by his wife, consisted of a check for $10,000 which was drawn on the earnings of Priority Mills and was signed by the petitioner. The petitioner's wife had no separate capital of her own. Under the first issue, the evidence did not establish that petitioner's wife owned any part of the business known as Priority Mills. There was no capital account in her name, and she did not have any dominion or control over the earnings of Priority Mills. It has been concluded, under the first issue, that the business known as Priority Mills was, in fact, a sole proprietorship which was owned and operated by petitioner. Under the second issue, there is no evidence upon which it could be found as a fact that petitioner's wife received $5,000 from petitioner as a gift, which she then contributed to the capital of Sugar Feed. It cannot be found as a fact that the wife of the petitioner made any *202 contribution to the capital of Sugar Feed, and it has been found as a fact that she did not make a contribution of capital to that business. It has been found as a fact that the petitioner contributed $10,000 to the capital of Sugar Feed. The record is lacking in evidence to show that any business purpose was served by the purported inclusion of the petitioner's wife as a partner in Sugar Feed. Therefore, upon all of the evidence, it has been found as a fact that the petitioner did not in good faith and with a business purpose intend to join with his wife in partnership during 1943 in the present conduct of the business called Sugar Feed. It is held that the wife of petitioner was not a member of the partnership during 1943. There is a further question under this issue relating to the amount of petitioner's share of the 1943 earnings of Sugar Feed. The evidence shows that $10,000 was withdrawn from Priority Mills by the petitioner for contribution to the capital of the alleged partnership known as Sugar Feed, and that three others, the father, mother, and sister of the petitioner made contributions to the alleged new "partnership" in the total amount of $15,000. It appears, therefore, *203 that the petitioner contributed two-fifths of the capital of a new business known as Sugar Feed, and that he, therefore, owned two-fifths of the earnings. This has been found as a fact. The respondent determined, however, that petitioner was taxable in 1943 upon 50 per cent of the earnings of Sugar Feed, or $16,781.17. Petitioner, in his return for 1943, reported $5,411.67 as his share of the earnings of the above named business, which, we understand, represented one-fifth thereof, and the respondent, under the above determination, added $11,369.50 to petitioner's income. Respondent erred in his determination to the extent that he included in petitioner's income for 1943 an amount in excess of two-fifths of the corrected net earnings of Sugar Feed. It has been stipulated that the corrected net income of Sugar Feed in 1943 amounted to $33,562.34. In the recomputation under Rule 50, there shall be excluded from the income of petitioner for 1943, the amount of the earnings of Sugar Feed which exceeds two-fifths thereof. Under the second issue in this proceeding, it has been necessary to refer to the alleged interests in 1943 of the father, the mother, and the sister of the petitioner *204 in the business of Sugar Feed. The uncontradicted evidence in this proceeding shows that $25,000 was contributed to Sugar Feed, of which total amount the petitioner contributed $10,000, or two-fifths. The petitioner is the only taxpayer involved in this proceeding, and the question under the second issue is to determine the amount of the 1943 earnings of Sugar Feed which is taxable to petitioner. In deciding this question, we do not undertake decision of any other questions relating to the relationship of persons other than petitioner and his wife to the business of Sugar Feed. Neither the father, the mother, nor the sister of the petitioner are parties to this proceeding. Respondent, on brief, contends that there is a question in this proceeding whether petitioner's sister was a member of an alleged partnership, but such question is not raised by the pleadings, and we do not undertake to decide such question. All that is decided here is that $25,000 was put into a business venture known as Sugar Feed, and of that amount petitioner contributed $10,000. Those are facts, regardless of what kind of entity the business known as Sugar Feed is, and regardless of whether the sister of petitioner *205 was or was not a partner in that business. Therefore, it has been concluded that the respondent erred in attributing to petitioner 50 per cent of the 1943 earnings of Sugar Feed, and that petitioner is not taxable upon earnings in excess of two-fifths of the total earnings. Decision will be entered under Rule 50.